UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**THE TRADE GROUP, INC.,**

   Plaintiff,

v.                                   No. 4:23-cv-00555-P

**BTC MEDIA, LLC,**

   Defendant.

## OPINION & ORDER

Before the Court is Defendant's Motion to Dismiss for Lack of Personal Jurisdiction. ECF No. 10. Having considered the Motion and related filings, the Court determines the Motion should be and hereby is **DENIED** for the reasons below.

## BACKGROUND

Defendant BTC Media, LLC sponsors a yearly Bitcoin conference aptly called "Bitcoin." Plaintiff The Trade Group, Inc. ("TTG") is an event marketing and design firm. In 2021, BTC hired TTG to organize that year's conference. With TTG's help, Bitcoin 2021 was a roaring success. In fact, the conference was "the largest Bitcoin event in history" and featured such varied speakers as Wyoming Senator Cynthia Lummis, former Texas Congressman Ron Paul, and skateboarding legend Tony Hawk. Bullish to make Bitcoin 2022 even better, BTC retained TTG again—though they didn't sign a contract specifying the engagement's terms.

Things went smoothly for a while leading up to Bitcoin 2022. TTG provided consulting and event-management services from its Grapevine, Texas headquarters and BTC paid its invoices on time. In April 2022, the parties executed a Deposit Agreement formalizing BTC's remuneration obligations. Around that time, however, BTC told TTG it was "experiencing financial difficulties" and would "pay TTG as soon as it was able." One thing led to another, and a week turned into a month

turned into a year. After several vain attempts to collect on outstanding invoices, TTG sued BTC in Texas state court in May 2023.

BTC removed the case to this Court on June 5. Shortly thereafter, BTC moved to dismiss the case for lack of personal jurisdiction. As BTC sees things, Bitcoin 2022 was held in Miami, Florida, and most of TTG's services were rendered there. Thus, according to BTC, this action is "centered in Florida" and doesn't belong in the Northern District of Texas. TTG sees things differently. TTG acknowledges its vendors and subcontractors rendered services for Bitcoin 2022 in Miami. But TTG performed all the work leading up to the conference from Texas and strategized with BTC from Texas. And importantly, BTC paid TTG via Texas bank accounts. Thus, TTG says the Court has personal jurisdiction and should deny BTC's Motion. TTG is correct.

## LEGAL STANDARD

"Federal courts are courts of limited jurisdiction" that "possess only that power authorized by the Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "A court must have the power to decide the claim before it (subject-matter jurisdiction) and power over the parties before it (personal jurisdiction) before it can resolve a case." *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95 (2017). Where the latter is absent, parties may move to dismiss a complaint under Rule 12(b)(2). *See* FED. R. CIV. P. 12(b)(2). The burden rests with the plaintiff to defeat a Rule 12(b)(2) jurisdictional challenge by establishing a prima facie jurisdictional claim. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 399 (5th Cir. 2009).

To rule on a 12(b)(2) motion, federal courts must determine whether personal jurisdiction is present by looking to the law of the state in which they sit. *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)). "In Texas, courts evaluate personal jurisdiction over nonresident defendants through a two-step inquiry, ensuring compliance with the state's long-arm statute and the Due Process Clause of the Fourteenth Amendment." *Bulkley & Assocs., LLC v. Dep't of Indus. Rels.*, 1 F.4th 346, 351 (5th Cir. 2021). This is

ultimately a single inquiry in Texas, as "the Texas long-arm statute extends to the limits of federal due process." *Sangha v. Navig8 Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018).

## ANALYSIS

BTC wants this case in Florida; TTG wants it here. BTC says "[t]he bulk of the contract was performed in Florida, the physical location of the conference." ECF No. 10 at 1. BTC counters by pointing to significant performance in Texas, particularly with respect to the April 2022 Deposit Agreement. ECF No. 12 at 5. As explained below, the Texas-based contractual performance—and the Texas-based contractual breach—establish this Court's personal jurisdiction over BTC. As further detailed below, transfer to the Southern District of Florida is unwarranted because the instant action was filed prior to a related case in Florida and suffers no jurisdictional defect.

### A. The Court has personal jurisdiction over BTC.

BTC's headquarters are in Tennessee; TTG's in Texas. Because BTC is a non-resident, personal jurisdiction must satisfy Texas's long-arm statute and the Fourteenth Amendment. *Bulkley & Assocs.*, 1 F.4th at 351. As noted above, the two are coterminal, so the Court need only ask if personal jurisdiction satisfies due process. *Sangha*, 882 F.3d at 101. To answer this, the Court asks if BTC has "minimum contacts" with Texas such that imposing a judgment would not "offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945). This inquiry can be distilled into three related questions. *First*, the Court asks if BTC "purposely directed its activities toward [Texas] or purposely availed itself of the privileges of conducting activities there." *Def. Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020). It did. *Second*, the Court asks if this case "arises out of or results from [BTC's] forum-related contacts." *Id.*[1] It does. *Third*,

---

[1] BTC's forum-related contacts must support either general or specific personal jurisdiction. The former arises where a non-resident defendant has "continuous and systematic" contacts with a state, regardless of whether the contacts relate to the claim. *See Cent. Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003). The parties agree the Court lacks general personal jurisdiction over BTC. *See* ECF No. 12 at 11. But specific personal

3

the Court asks if "the exercise of personal jurisdiction is fair and reasonable." *Id.* It is.

### 1. The case arises from commercial activity BTC directed toward/conducted in Texas.

BTC conducted commercial activity in Texas over the course of many months in its collaboration with TTG. The Fifth Circuit has long found minimum contacts where "a nonresident defendant takes purposeful and affirmative action, the effect of which is to cause business activity, foreseeable by the defendant, in the forum state." *Miss. Interstate Exp., Inc. v. Transpo, Inc.* 681 F.2d 1003, 1007 (5th Cir. 1982). BTC knew TTG was in Texas when it worked with TTG to prepare for Bitcoin 2022. ECF No. 13-1 at 2. BTC communicated extensively with TTG in Texas. *See* ECF Nos. 10-1 at 4; 13-1 at 3, 8. BTC used TTG's Texas-based tracking system to log conference expenses. ECF No. 13-1 at 4. And importantly, BTC paid TTG in Texas pursuant to the Deposit Agreement. *Id.* at 8–12. Even if BTC never had boots on the ground in Texas, the Fifth Circuit has found specific personal jurisdiction under identical circumstances. *See Cent. Freight*, 322 F.3d at 382 (finding specific personal jurisdiction where non-resident "specifically and deliberately reached out to a Texas corporation by telephone and mail with the deliberate aim of entering into a long-standing contractual relationship with a Texas corporation").

True, "merely contracting with a resident of the forum state does not establish minimum contacts." *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007). But the above examples show BTC's contacts go beyond the Deposit Agreement itself. While BTC emphasizes the work of TTG's employees, vendors, and subcontractors in Miami, *see, e.g.*, ECF No. 10-1, TTG orchestrated conference preparations from Texas. *See* ECF No. 13-1. Many event planners will attest that, for enormous events like Bitcoin, the actual conference is the tip of the

---

jurisdiction is different, arising where the non-resident defendant "purposefully directed its activities at residents of the forum and the litigation . . . arise[s] out of or relates to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). The Court's inquiry here solely concerns specific personal jurisdiction.

iceberg—the fruit of extensive work done long before the event space was ready. The Court is thus unpersuaded by BTC's feigned shock that a Texas-based company would perform relevant services in Texas. Even if Texas-based legwork was "TTG's unilateral decision and not BTC's," *see* ECF No. 10 at 3–4, it requires little clairvoyance to predict that a Texas-based company would work from its Texas-based offices. Indeed, TTG *had* to work from Texas considering it was retained many months in advance of the actual conference in Miami. ECF No. 13-1 at 2.

BTC attempts a subtle sleight-of-hand on this point by highlighting TTG's work in Miami while ignoring BTC's communications with TTG in Texas and BTC's repeated deposits into TTG's Texas bank accounts. *See* ECF No. 10 at 4–7. If this lawsuit involved TTG's failure to perform in Dade County, the analysis would be different. But the relevant breach was BTC's failure to pay TTG in Texas for services substantially performed in Texas. *See* ECF No. 6. While TTG's performance was partially in Florida, BTC's performance—namely, paying TTG after representing that it would—was exclusively required in Texas. ECF No. 13-1 at 2–5. Thus, connections to Florida aside, the relevant contractual breach occurred here.[2] *See Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir. 1993) ("A single act by the defendant directed at the forum state [ ] can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted.").[3]

---

[2]That's the flaw of BTC's reliance on *Moncrief*. ECF No. 10 at 5–6. Here, both parties performed in Texas. There, the Court held that "a plaintiff's unilateral activities in Texas do not constitute minimum contacts where the defendant did not perform any of its obligations in Texas, the contract did not require performance in Texas, and the contract is centered outside of Texas." 481 F.3d at 312. Moreover, even if BTC argues the contract was centered in Florida, it indisputably required TTG to provide event-planning services that, practically speaking, could only be done from Texas months before the physical conference was set up (to say nothing of the Deposit Agreement's requirement that BTC pay TTG in Texas). There's also the distinguishing fact that *Moncrief* involved a contract that expressly required arbitration in Russia under Russian law. *Id.* at 313.

[3]BTC's briefing suggests BTC didn't direct its commercial activity toward *Texas*, but rather toward *TTG*, noting that "TTG's location in Texas had no bearing on BTC's decision to engage TTG." ECF No. 10-1 at 3; *see also* ECF No. 10 at 8 (noting "any payments sent to TTG in Texas would have been made regardless of TTG's location"). Given TTG's principal place of business in

5

So BTC directed commercial activity toward Texas (by contracting with TTG) and purposely availed itself of the privileges of doing business here (by working with TTG and allegedly breaching the contract here). TTG tendered performance in Texas but allegedly got stiffed. If TTG's allegations are true, BTC "purposefully derive[d] benefit" in Texas and should be held accountable here. *See Kulko v. Cal. Sup. Ct.*, 436 U.S. 84, 96 (1978). In this regard, Florida's hypothetical interests in this case don't speak to the constitutionality of personal jurisdiction in Texas. This is especially true considering the relevant contractual breach did not concern anything TTG or BTC did in Florida; it concerned what BTC did (or rather, *didn't*) do in Texas. Having answered the first two questions affirmatively, the Court must next ask if any case-specific facts render personal jurisdiction over BTC unfair or unreasonable.

### 2. Exercising personal jurisdiction over BTC is fair and reasonable.

The "fair and reasonable" inquiry under *International Shoe* is essentially a catch-all provision to ensure courts consider the facts of each case in evaluating personal jurisdiction. *See Shaffer v Heitner*, 433 U.S. 186, 204 (1977) ("[T]he relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the States . . . became the central concern of the inquiry into personal jurisdiction."). BTC discusses TTG's Florida-based performance ad nauseum, *see* ECF No. 10 at 4–7, but doesn't explain why Florida's connections render personal jurisdiction in this District unfair or unreasonable. With the complexity of modern interstate commerce, many states may have connections to a claim. But "the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Burger*

---

Texas, that's a distinction without a difference. It doesn't matter whether a defendant aimed its sights at a given state if they voluntarily engaged in commercial activity with an entity *located in that state*. *See Burger King*, 471 U.S. at 480 (jurisdiction proper over Michigan defendant who knowingly contracted with Florida-based burger chain); *Cent. Freight*, 322 F.3d at 382 (affirming trial court's finding of personal jurisdiction and observing that "by entering into the [ ] Agreement, [Defendant] knew that it was affiliating with an enterprise based primarily in Texas").

*King*, 471 U.S. at 474. BTC voluntarily assumed Texas obligations and should be held accountable for them here.

Almost seventy years ago, the Supreme Court recognized that "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957). That was before the Internet, smartphones, laptops, and Zoom—the premise is infinitely truer now than it was in 1957. If BTC could collaborate with TTG to organize and orchestrate the "largest Bitcoin event in history" from Texas, BTC can litigate this case in Texas. This is not to say technological advances have eroded the territorial considerations of due process.[4] But BTC cannot escape the fact that the only relevant contractual breach—its alleged failure to pay for TTG's goods and services—arose from BTC's voluntary activity in Texas.

No litigation is hassle-free for a defendant in BTC's position. Thus, the Court's inquiry is not whether litigating this claim is uniquely more convenient in Fort Worth rather than Miami. All else equal, the Court can think of several reasons one might [hypothetically] prefer South Beach to Cowtown. But the Court need only ask if litigating this case here would pose such unreasonable difficulties upon BTC that BTC's due process rights would be violated. *Ruston Gas Turbines*, 9 F.3d at 421; *see also World-Wide Volkswagen*, 444 U.S. at 292–95 (explicating Supreme Court jurisprudence on the due process prohibition of inconvenient litigation). The relief BTC seeks would force an alleged non-breaching party to travel 1,344 miles to recover monies due from an alleged breaching party—monies due in Texas accounts for work largely done in Texas. That's neither fair nor reasonable for TTG. With

---

[4]This point cannot be overstated, as modern plaintiffs may be increasingly enticed to stretch the limits of due process on account of the ease of litigating in a post-Zoom world. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980) (cleaned up) ("Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation; the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.").

headquarters in Nashville, BTC will have to travel either way—whether to the Southern District of Florida or the Northern District of Texas.[5] The Fourteenth Amendment keeps the State from taking life, liberty, or property without due process of the law; it doesn't keep companies from litigation in unpreferable (but otherwise proper) jurisdictions.

To conclude, Florida's connections to this case are not altogether unimportant, but they are red herrings for the present jurisdictional inquiry. BTC allegedly breached a contract here and now its time to face the music. In the future, BTC should avoid contracting and collaborating with entities in jurisdictions where BTC doesn't want to risk suit. *See World-Wide Volkswagen*, 444 U.S. at 297 (noting the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit"). For now, that ship has sailed. The Court **DENIES** BTC's Motion accordingly.

### B. The case shouldn't be transferred to the Southern District of Florida.

BTC contends that "[i]f the Court does not dismiss the complaint outright" it should nevertheless transfer this case to the Southern District of Florida, where BTC is suing TTG in a related action. ECF No. 10 at 9 (citing 28 U.S.C. § 1631). But transfer under 28 U.S.C. § 1631 is only proper where the transferee district would have jurisdiction (which the Southern District of Florida arguably would) and where the transferor district lacks subject-matter or personal jurisdiction (neither of which this Court lacks). *See Franco v. Mabe Trucking Co., Inc.*, 3 F.4th 788, 792–93 (5th Cir. 2021). Because this case is not jurisdictionally

---

[5]The only difference is that Fort Worth is closer to Nashville, Fort Worth's hotels are cheaper than Miami's and more daily flights connect Nashville to DFW than Nashville to Miami. *See generally Overnight Hotel Rates: North America*, STATISTA, https://www.statista.com/statistics/1060191/overnight-hotel-rates-north-america/ (last visited Sept. 21, 2023); Daily Flights between Nashville, TN and Miami, FL; Nashville, TN and Dallas-Fort Worth, TX, FLIGHT CONNECTIONS, https://www.flightconnections.com (insert "Nashville, TN" in "from" destination field and "Dallas-Fort Worth, TX" in "to" destination field; repeat query with "Miami, FL" in "to" destination field).

defective, transfer is inappropriate under Section 1631. *Id.* Moreover, as well briefed in TTG's Response, this case was filed first. ECF No. 12 at 23–24; *see also* ECF No. 13-1 at 22, 29 (indicating the Florida action was filed on June 2, 2023—almost a month after this case). The Fifth Circuit applies the first-filed rule in determining which of two or more parallel cases should proceed. *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997). Thus, even if transfer was proper under a different statutory provision, this case should proceed unhindered as the first-filed among parallel cases.

## CONCLUSION

For the reasons above, the Court determines (1) due process is unviolated by litigating this case in the Northern District of Texas and (2) transfer to the Southern District of Florida is unwarranted. Accordingly, the Court **DENIES** BTC's Motion. ECF No. 10.

**SO ORDERED** on this **22nd day** of **September 2023.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE