THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| The Trade Group, Inc., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-0555-P |
| | § | |
| BTC Media, LLC, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## JOINT PRETRIAL ORDER

Under Local Rule 16.4 and this Court's Scheduling Order (ECF No. 16 at 4–5), Plaintiff The Trade Group ("Plaintiff" or "Trade Group") and Defendants BTC Media, LLC ("BTC Media") and BTC Inc. ("BTCI") (collectively "Defendants") submit this Joint Pretrial Order.

## I.    SUMMARY OF CLAIMS AND DEFENSES OF EACH PARTY

### A.    PLAINTIFF

**1. Plaintiff's Claims**: Trade Group asserts six claims under Texas law against BTC Media for unpaid goods and services, audit fees, and storage fees relating to BTC Media's Bitcoin event in 2022 ("Bitcoin 2022"). Trade Group also seeks to hold BTCI liable for all six claims under alter-ego liability and agency liability pursuant to Delaware law. In total, Trade Group seeks at least $4,966,192.86 from Defendants, plus the amounts recoverable under the parties' contract and Texas law for interest and the attorneys' fees and costs incurred by Trade Group in pursuing its claims and defending itself against BTC Media's withdrawn DTPA claim and pending fraud claim.

#### i.    *Goods-and-Services Claims*

Trade Group asserts three claims under Texas law against BTC Media for unpaid goods and services provided to BTC Media in connection with Bitcoin 2022: (1) breach of contract; (2)

suit on account; (3) and quantum meruit.

Breach of Contract: Trade Group first asserts a breach-of-contract claim seeking $4,746,047.64 for BTC Media's failure to comply with its agreement to pay Trade Group for the goods and services that Trade Group provided to BTC Media for Bitcoin 2022 (the "Event Agreement"). After Trade Group successfully performed BTC Media's Bitcoin event in 2021—and billed BTC Media for its services using a Google Sheet accessible to both parties—BTC Media rehired Trade Group to plan, produce, and execute Bitcoin 2022. Leading up to Bitcoin 2022, Trade Group emailed the Event Agreement to BTC Media's Director of Events, Justin Doochin, and stated in the email that it was an acknowledgment in writing of the Google Sheet (the "Account") in which Trade Group—like it did for Bitcoin 2021—had entered the costs of all goods and services provided in connection with Bitcoin 2022. The Event Agreement provided that for unpaid goods and services listed on the Account, "the remaining deposit due" was $3,661,144.86 and that a final bill including "adds, changes, or any on-site requests" would be sent to BTC Media "post Bitcoin 2022." The $3,661,144.86 amount due, as reflected on the Event Agreement, was based on the subtotal amount of $14,921,026.05 for goods and services listed on the Account, plus $895,311.56 for sales tax, and minus the $12,155,192.75 amount that had been paid by BTC Media as of that date. The Event Agreement also provided that "Trade Group agrees to sell to Purchaser and Purchaser agrees to purchase goods and/or services described above on the terms and conditions within this agreement" and that "Purchaser acknowledges he/she has read, understands, and agrees to the terms of this Proposal."

Justin Doochin reviewed the Event Agreement; understood that it was both an agreement to pay the remaining amount due of $3,661,144.86 for goods and services as well as an agreement to pay for adds, changes, and any on-site requests, which would be set forth on the Account after

it was finalized and reconciled post-Bitcoin 2022; and accepted the Event Agreement by signing it on BTC Media's behalf. BTC Media's agreement to pay the amounts set forth on the Account is consistent with—and further evidenced by—the parties' course of dealing and prior conduct. After Mr. Doochin signed the Event Agreement, BTC Media requested that Trade Group provide additional goods and services for Bitcoin 2022, which were later added to the Account and totaled $1,113,642.78. BTC Media accepted to pay Trade Group that amount by its acts, conduct, and acquiescence pursuant to the agreement for adds, changes, and any on-site requests and the parties' course of dealing and conduct.

BTC Media accepted all goods and services provided by Trade Group, asserted that it would pay Trade Group for them, and made partial payments after receiving them. However, to date, BTC Media has failed to pay the $4,746,047.64 balance set forth on the Account for those duly requested goods and services. This amount includes all credits and payments made by BTC Media that occurred post-Bitcoin 2022. BTC Media's failure to pay this amount constitutes a breach of the Event Agreement. Thus, Trade Group seeks to recover $4,746,047.64 under its breach-of-contract claim for BTC Media's breach of the Event Agreement.

Suit on Account: Trade Group's suit-on-account claim seeks to recover the amount charged on the Account for any unpaid goods and services for which Trade Group does not recover under its breach-of-contract claim. Leading up to Bitcoin 2022, BTC Media had paid Trade Group $12,155,192.75 on invoices for goods and services provided in connection with Bitcoin 2022. After making those payments but before Bitcoin 2022, BTC Media then requested and, in signing the Event Agreement, expressly agreed to pay for an additional $3,666,144.86 worth of goods and services reflected on the Account at the time of the Event Agreement. It also expressly agreed, in signing the Event Agreement, to pay the price of those goods and services requested at Bitcoin

41488028v.5

2022 and added to the Account thereafter. Pursuant to that agreement, Trade Group updated the Account after the show to reflect an additional charge of $1,113,642.78 for the goods and services BTC Media requested at Bitcoin 2022. After reconciling the Account balance and accounting for additional discounts and credits, Trade Group sent BTC Media a final invoice for all unpaid goods and services listed on the Account. The prices on the Account were also usual, reasonable, and customary in the trade show industry.

BTC Media accepted all goods and services reflected on the Account. It did not second guess its agreements to pay Trade Group's prices for those goods and services or object to them before acceptance. And yet, despite profiting off Bitcoin 2022, BTC Media has only made two partial payments toward its debt. After the conference, BTC Media represented to Trade Group on numerous occasions that it was experiencing financial difficulties—which Trade Group now understands were products of BTC Media's poor financial decisions and a sharp plunge in the value of Bitcoin—but would pay Trade Group the full amount it owed as soon as possible. To date, the full amount owed on the Account is $4,746,047.64. Because all the unpaid goods and services were delivered or performed, the prices charged were per the Event Agreement and reasonable, and the final invoice for those goods and services is unpaid, Trade Group seeks to recover that amount under its suit-on-account claim.

<u>Quantum Meruit</u>: Trade Group alternatively seeks to recover, under quantum meruit, the reasonable value of any unpaid goods and services for which Trade Group does not recover under its suit-on-account or breach-of-contract claims. Trade Group provided goods and services to BTC Media, who kept, used, and enjoyed those goods and services without paying for them. BTC Media also had reasonable notice that the goods and services were not free and understood that it had to pay Trade Group for them. Thus, because BTC Media knew of Trade Group's expectation to be

paid for goods and services provided for Bitcoin 2022, accepted those goods and services, and failed to pay for them, it was unjustly enriched and owes Trade Group the reasonable value of those goods and services. The reasonable value for unpaid goods and services is $4,746,047.64 in total.

### ii.    *Audit-Fees Claims*

After Bitcoin 2022, BTC Media requested an audit of Trade Group's invoices and promised to pay Trade Group if it retained an auditor to perform the audit. Trade Group retained an auditor but has not been paid for the audit fees. As a result, Trade Group asserts breach-of-contract and quantum-meruit claims against BTC Media for the unpaid audit fees.

Breach of Contract: BTC Media requested that Trade Group retain an auditor to perform an audit of Trade Group's invoicing relating to Bitcoin 2022 and offered to pay Trade Group half of the audit fees in return. Trade Group accepted that offer and retained an auditor to conduct an analysis of its Bitcoin 2022 invoices. The audit results—concluding that Trade Group accurately billed BTC Media for Bitcoin 2022—were provided to and accepted by BTC Media. Because Trade Group was charged $45,405.00 for the audit, it requested that BTC Media pay $22,702.50 for its portion of the audit fees. BTC Media, however, breached the Audit Agreement by failing to pay its portion of the audit fees. As a result of BTC Media's breach, Trade Group seeks $22,702.50.

Quantum Meruit: In the alternative, Trade Group seeks to recover the reasonable value for the audit provided to BTC Media under quantum meruit. BTC Media requested that Trade Group obtain an auditor to audit Trade Group's Bitcoin 2022 invoices to ensure that it was billed accurately. Despite having no obligation to do so, Trade Group retained an auditor, provided the audit report to BTC Media, and notified BTC Media of its expectation of being paid for the audit. BTC Media accepted the audit and used and the auditors' analysis to ensure that it was billed

accurately. Because BTC Media has failed to pay the audit fees and was thus unjustly enriched, Trade Group is entitled to recover the reasonable value for the $45,405.00 audit under quantum meruit.

### iii.    Storage-Fees Claim

BTC Media praised Trade Group for the Bitcoin 2022 event and requested that Trade Group begin planning for BTC Media's Bitcoin 2023 event ("Bitcoin 2023"). Trade Group agreed to do so and coordinated with BTC Media to store various goods used at Bitcoin 2022 for use at Bitcoin 2023. Trade Group informed BTC Media that it had coordinated with a warehouse in Texas to store the goods and, under the condition that Trade Group would remain BTC Media's production partner for Bitcoin 2023, offered to store the goods at no cost to BTC Media. BTC Media agreed and used that warehouse to store its various goods. Though BTC Media decided that it would not use Trade Group for Bitcoin 2023 as early as November 2022, it failed to inform Trade Group of that decision then and instead continued to take advantage of Trade Group's storage facility. In April 2023, Trade Group requested payment from BTC Media for the storage fees. Yet BTC Media refused to pay for any storage fees—totaling $151,000 to date and continuing to accrue—or retrieve its goods. BTC Media was thus unjustly enriched by its use of the storage space for its goods. As a result, Trade Group seeks to recover the reasonable value for such storage—at least $151,000—under quantum meruit.

### iv.    BTCI's Liability

Trade Group seeks to hold BTCI liable to Trade Group for all six of the foregoing claims under alter-ego liability and agency liability pursuant to Delaware law.

<u>Alter Ego</u>: Trade Group first seeks to hold BTCI vicariously liable to Trade Group for all six claims asserted against BTC Media for BTCI's use of BTC Media as its alter ego.

41488028v.5

Despite BTC Media and BTCI having different names, the two entities function as a single economic entity. Both entities commingle assets and routinely transfer money between their accounts without any internal approvals or written policies governing these transfers. BTCI receives Bitcoin payments into a wallet in its name for BTC Media's Bitcoin events yet uses BTC Media's name to sign contracts—like the Event Agreement—on BTCI's behalf. BTCI independently generates no revenue. All of its revenue comes from BTC Media. BTCI also siphons BTC Media's funds for BTCI's CEO's personal benefit and use without any approval from BTC Media, such as purchasing a $5.25-million-dollar home and $77,000-dollar truck.

Despite BTCI's use of BTC Media's assets and revenue, BTC Media is undercapitalized and relies exclusively on BTCI to pay its debts and liabilities. For example, BTC Media lacked sufficient funds to pay a debt that became due to Trade Group just weeks before Bitcoin 2022, so BTCI transferred $1.1 million to BTC Media to help cover that debt.

BTCI and BTC Media's lack of distinction also extends to their operations, where they share the same office space and lack any operational distinction. Even their employees cannot distinguish between the two entities or by which one they are employed. This blending is further highlighted by their financial maneuvers, including their consolidation of finances, subsequent separation of their finances in 2020 when applying for federal loans, and reconsolidation of their finances the next year.

At bottom, BTC Media is merely a name BTCI uses to shield itself from contractual liability and for its direct personal benefit. Because allowing BTCI to shield itself from liability and use its undercapitalized subsidiary is unjust, unfair, and inequitable, Trade Group seeks to hold BTCI vicariously liable to Trade Group for all six claims asserted against BTC Media under alter-ego liability.

Agency Liability: Trade Group next seeks to hold BTCI liable for using BTC Media as its agent for BTCI's benefit. BTCI authorized BTC Media to act on BTCI's behalf and subject to BTCI's control for the parties' transactions. Specifically, BTCI used and controlled BTC Media to communicate with Trade Group throughout the parties' business relationship, including all communications regarding Trade Group's goods and services, prices, payments, audit fees, and storage fees. BTCI also used and controlled BTC Media to pay Trade Group for goods and services and sign the Event Agreement for BTCI's benefit. BTCI then used its control over BTC Media to prevent payment to Trade Group for the unpaid goods and services for which Trade Group brings claims. It also prevented BTC Media from fulfilling its debts to Trade Group by siphoning off BTC Media's assets. And yet, despite BTCI using BTC Media as its agent in its dealing with Trade Group, BTCI failed to fully disclose its identity to Trade Group during the parties' business relationship. As a result, Trade Group seeks to hold BTCI liable on all Trade Group's causes of action under agency liability.

### v.    *Attorneys' Fees*

Trade Group is entitled to recover reasonable attorneys' fees under the Event Agreement and Section 38.001 of the Texas Civil Practice and Remedies Code if it prevails on its suit-on-account or breach-of-contract claims. Because Trade Group's breach-of-contract and suit-on-account claims are governed by Texas law, Texas law controls the award of attorneys' fees. Under Texas law, a party is entitled to collect attorneys' fees when authorized by the parties' contract or Texas statute. Trade Group is entitled to recover attorneys' fees under the parties' contract—i.e., the Event Agreement—which provides that "[BTC Media] agrees to pay Trade Group reasonable expenses for repossession and enforcement of Trade Group rights, including any attorney or collection agency fees, together with interest, until the date full payment is made." Trade Group is

also entitled to recover attorneys' fees under Section 38.001 of the Texas Civil Practice and Remedies Code, which allows a prevailing party to recover attorneys' fees for breach-of-contract and suit-on-account claims. *See* TEX. CIV. PRAC. & REM. CODE § 38.001(8).  Trade Group will seek its attorneys' fees in a post-judgment motion to the Court pursuant to Federal Rule of Civil Procedure 54(d)(2)(A).

**2. Plaintiff's Defenses**: Trade Group asserts five defenses to BTC Media's Texas common-law fraud counterclaims, three defenses to BTC Media's fraud counterclaim, and two counter-defenses to BTC Media's affirmative defenses.[1]

### i.    *BTC Media's Fraud Counterclaims*

Economic-Loss Rule: BTC Media's counterclaims are barred by the economic-loss rule because the counterclaims are based on Trade Group's alleged failure to perform a contractual promise to provide all-inclusive booth pricing and seek to recover only the economic loss of that alleged contractual expectancy.

BTC Media's Fault: Trade Group is not liable to BTC Media because BTC Media's own acts or omissions proximately caused or contributed to BTC Media's injury—if any. BTC Media contributed to its own injury by, among other things, selling at least 45 booths before it received Trade Group's booth quotes; pricing booths to subsidize other event costs while failing to account for those costs; including numerous items unrelated to booths in booth packages at no cost to the purchaser; and failing to track the amount it earned on each booth.

---

[1] BTC Media withdrew its DTPA counterclaim.

41488028v.5

<u>Trade Group Lacked Knowledge of Falsity</u>: Trade Group is not liable to BTC Media because Trade Group did not know and could not reasonably have known of the alleged falsity or inaccuracy of the information BTC Media alleges was the producing cause of its injury.

<u>Failure to Mitigate Damages</u>: BTC Media failed to mitigate its damages—if any—by—including but not limited to—selling booths before it knew its costs for booths; using booths to subsidize other event costs but failing to account for those costs; failing to track the amount it earned on each booth; including numerous items unrelated to booths in booth packages at no cost to the purchaser; and failing to charge higher prices for its booths.

<u>Quasi-Estoppel:</u> Even if the jury finds Trade Group committed fraud, the jury cannot award damages because (1) BTC Media acquiesced to or benefited from a position inconsistent with its present position, (2) it would be unconscionable to allow BTC Media to claim fraud, and (3) BTC Media had knowledge of all material facts at the time of the conduct it claims was fraudulent.

### ii.    *BTC Media's Fraud Counterclaim*

<u>Representation of Future Performance is Not Actionable</u>: BTC Media's fraud counterclaim is not an actionable fraud claim because it is based on an alleged false promise of future performance.

<u>Standing</u>: BTC Media lacks standing for its fraud counterclaim because it did not pay Trade Group for the booth charges it claims are its injury.

### iii.    *Counter-Defenses to BTC Media's Affirmative Defenses*

<u>Waiver of BTC Media's Lack-of-Authority Defense</u>: BTC Media's summary-judgment response failed to respond to Trade Group's summary-judgment arguments on its lack-of-authority defense, so BTC Media waived or abandoned that defense. *See* Trade Group's Mot. for Summ. J.,

41488028v.5

ECF No. 83 at 20–26; BTC Media's Resp. to Trade Group's Mot. for Summ. J., ECF No. 92 at 36, 41.

Waiver of BTC Media's Newly-Pleaded Defenses of Accord and Satisfaction, Fraudulent Inducement, Payment and Release, and Ambiguity: BTC Media's Answer was based on Trade Group's Second Amended Complaint, in which Trade Group added BTCI as a defendant, Trade Group's veil piercing theories, and statements related to those theories. Trade Group did not change or add a statement related to any affirmative claims. *Compare* Trade Group's First Am. Compl., ECF No. 6, *with* Trade Group's Second Am. Compl., ECF No. 38. BTC Media, however, asserted four affirmative new defenses to Trade Group's breach-of-contract claim—accord and satisfaction, fraudulent inducement, payment and release, and ambiguity—that were not asserted in BTC Media's Answer to Trade Group's First Amended Complaint. *Compare* BTC Media's Answer to Trade Group's First Am. Compl., ECF No. 21 at 8–9, *with* Trade Group's BTC Media's Answer to Trade Group's Second Am. Compl., ECF No. 51 ¶¶ 10–13. These affirmative defenses are not responsive to any new claims or statements asserted in Trade Group's Second Amended Complaint. Because BTC Media only received leave to assert its counterclaims (ECF No. 57) and did not receive leave for those affirmative defenses as required, BTC Media's defenses of accord and satisfaction, fraudulent inducement, payment and release, and ambiguity are waived.

**B.    DEFENDANTS**

**1. Defendant BTC Media, LLC's Defenses**

Breach of Contract and Sworn Account Claims. Though there was no written master services agreement in place, Trade Group and BTC Media agreed to several key payment terms for Bitcoin 2022. First, where Trade Group outsourced services to third parties, BTC Media agreed to pay a no-greater-than 10–15% markup on the third-party invoices for those services as

compensation to Trade Group for managing them. This was confirmed in an in-person meeting between BTC Media CEO David Bailey and Neeshu Hajra in Miami, Florida in January 2022. Separately, Hajra promised BTC Event Director Justin Doochin that Trade Group's markups on third-party invoices for services would not exceed 10–20%. The exception to the markup agreement was furniture invoices, which the parties agreed would be marked up 25%.

Second, where Trade Group provided specific quotes for items like exhibitor booths, Trade Group and BTC Media agreed that BTC would pay the amount of the quote and no more. And with booths, Trade Group promised BTC that the quoted prices for each standard small, medium, and large booth package would be all-inclusive and BTC would not be charged beyond the quote for booth-related items.

Trade Group and BTC agreed to use a Google Sheet to track estimated costs for the goods and services Trade Group was providing for Bitcoin 2022. The Google Sheet is a shared, cloud-based document that resides online. BTC Media representatives have had access to view the Google Sheet since Trade Group first provided access in January 2022. BTC Media and Trade Group agreed that the Google Sheet would accurately reflect (1) the parties' agreement to limit markups to the agreed-upon rates as well as (2) the specific quotes for items like booths where BTC Media agreed to pay a fixed price.

Trade Group first presented the Google Sheet to BTC Media in January 2022. The first Google Sheet in January 2022 showed an estimated budget of $17,590,986.91. BTC Media notified Trade Group that this was way too high and they needed to get the budget down to $10 million. BTC Media also raised the issue of markups on third-party invoices and asked to see individual invoices so it could verify the markup. Trade Group VP of Business Development Neeshu Hajra refused and threated to walk from the event and take vendors with him less than three months

before the event if BTC Media insisted on such transparency. Based on Hajra's reassurances that the Google Sheet would accurately reflect the agreements as to markups and quotes, BTC Media decided to continue the relationship with Trade Group.

The live Google Sheet was in constant flux from January until the event in April 2022 as goods and services were added, deleted, and prices changed. The Google Sheet's line-item descriptions are often vague and consist of merely a few words. The Google Sheet is not tied to Trade Group's internal accounting system, NAV, which Trade Group uses to log event production costs. It does not show the markups on third-party invoices, nor does it cross-reference third-party invoice numbers, purchase order numbers, sales order numbers, or any other specific cost detail from NAV. Moreover, the line items in the Google Sheet and the line items in NAV do not match. Nonetheless, the grand total amount of the Final Invoice Trade Group seeks to recover in this case and the grand total amount charged in NAV are the exact same—$17,214,980.39.

The lack of any connection between NAV's cost-documenting function and the line items in the Google Sheet means the line-item estimates therein are entirely manipulable by Trade Group. Indeed, neither BTC Media, its expert, nor even Trade Group has been able to fully match or tie third-party invoices from NAV with the charge (or charges) in the Google Sheet they support. Nonetheless, the $17.2 million Final Invoice Trade Group has sued to recover was generated from the unreliable and manipulable Google Sheet.

The Google Sheet and resulting Final Invoice are in breach of the parties' agreements as to markups and quotes. After the event, BTC Media traveled to Dallas to meet with Trade Group to try to resolve disputes about the final bill. At that meeting, Trade Group management represented, for the first time, that Trade Group's standard markup is 35%. As part of discovery in this litigation, BTC Media's expert analysis concluded that Trade Group's markups ranged from 25% to 107%,

with a mean of 46.7%. Trade Group's corporate representative testified that her own calculations showed markups for certain categories between 22–32%. But she admitted she had not calculated markups on all third-party invoices. No analysis has shown that the markups were within the 10–15% the parties agreed on. BTC Media never agreed to such exorbitant markups.

Also in discovery in this litigation, BTC Media learned that Trade Group misrepresented what it was charging for exhibitor booths in the Google Sheet. Trade Group quoted BTC Media prices for each small, medium, and large exhibitor booth package. Trade Group represented those prices as fixed, all-inclusive, and soup to nuts. The Final Invoice (and Google Sheet on which it is based) show that Trade Group charged the agreed-upon, fixed price for each small, medium, and large booth package. When multiplying the price of each booth times the number of booths Trade Group built, the total is $1,812,570.00, which is the amount Trade Group ostensibly charged for booths in the Final Invoice. But the internal accounting documents from NAV tell an entirely different story. Trade Group's internal sales order from NAV for standard booth packages shows that Trade Group really charged $2,906,173.95 for booths. But the grand total amount invoiced in the Google Doc and NAV are the same. The only way Trade Group could make that math work was to disperse and hide the $1,093,603.95 in booth overcharges in other, non-booth-related line items in the Google Sheet. Thus, Trade Group told BTC Media it was charging one price but actually charging a different, higher price.

Trade Group wants the Court and the jury to believe that BTC Media agreed to pay everything Trade Group put in the Google Sheet, whether valid or not. Nothing could be further from the truth. First, BTC Media did not accept all of the deliverables in the Google Sheet. There were mistakes, nondelivered items, and inappropriate charges that BTC Media disputed. Trade Group corrected some of those; it didn't correct others. Second, to the extent BTC Media accepted

any charges in the Google Sheet, that acceptance was conditional on Trade Group fulfilling its promise that markups would not exceed 10–15% and Trade Group would honor its quoted prices. But Trade Group charged far more in the Google Sheet than what it promised. Trade Group cannot recover on the Final Invoice because it is inconsistent with and violative of the parties' governing pricing agreements.

Trade Group contends that the Deposit Invoice Justin Doochin signed on April 3, 2022, was "both an agreement to pay the remaining amount due of $3,661,144.86 for goods and services as well as an agreement to pay for adds, changes, and any on-site requests, which would be set forth on the Account after it was finalized and reconciled post-Bitcoin 2022." Trade Group is wrong. First, an "agreement" induced by fraud is no agreement at all. Trade Group promised BTC Media that the Google Sheet would accurately reflect the parties' agreement to limit markups and honor quoted pricing. Those promises turned out to be false. Trade Group cannot now seek to collect on an agreement procured by fraud.

Second, Trade Group's argument that the Deposit Invoice constitutes a binding "Event Agreement" is self-defeating. An "agreement" to pay for unspecified goods and services that may be needed in the future at unspecified prices is merely an "agreement to agree" and thus no agreement at all. A binding contract requires a meeting of the minds on all essential terms, which must be definite and certain. At any given time during the event planning process, the amount in the Google Sheet was merely an estimate. Items were constantly being added and deleted, and costs changed as a result. Both parties knew there would be a final reconciliation post-event for BTC Media to verify the accuracy of the Google Sheet. And that's exactly what happened. Trade Group's final bill was revised multiple times over the course of several months as BTC Media pointed out inappropriate charges. So even the "Estimated Amount Due" of $3,661,144.86 was

just that—an estimate subject to a reconciliation process that could change the number. For BTC Media, the reconciliation process was not complete until discovery in this lawsuit, when the truth about Trade Group's charges was finally revealed.

As to Trade Group's claims of quantum meruit and unjust enrichment on the goods and services for Bitcoin 2022, Trade Group cannot recover under a quasi-contract theory because, as explained, there were express agreements as to markups and quotes that governed the pricing for Trade Group's goods and services for Bitcoin 2022. Regardless, Trade Group cannot show that its charges were reasonable because its markups were wildly in excess of industry standard rates.

Audit Fees Claim. BTC Media agreed to pay for an independent audit. The analysis conducted by HM&M, who is now serving as Trade Group's litigation expert, was neither independent nor an audit. Trade Group unilaterally selected HM&M, defined its scope of work, and guided HM&M's analysis, all to the exclusion of BTC Media. Additionally, HM&M disclaimed the term "audit" as a description of its analysis.

Trade Group cannot recover in quasi-contract for the audit fees because there was an express agreement covering the sharing of fees for an independent audit. Trade Group failed to abide by that express agreement, and thus cannot recover in quasi-contract. Moreover, HM&M's analysis, which was designed to convince BTC Media to pay Trade Group's exorbitant bill, conferred no benefit on BTC Media.

Storage Fees Claim. Notably, Trade Group makes no claim based on an express agreement between BTC Media and Trade Group for Trade Group to store assets used at Bitcoin 2022 and BTC Media to pay for such storage. At best, that service was gratuitously provided. After Bitcoin 2022, Trade Group told BTC Media that it wasn't charging for storage. There is no evidence the free-storage arrangement was conditional on BTC Media hiring Trade Group for Bitcoin 2023.

And there is no evidence all the assets being stored even belong to BTC Media. In fact, when BTC Media tried to retrieve some assets from Trade Group, it was refused because BTC Media allegedly hadn't paid Trade Group's full bill for Bitcoin 2022. Trade Group cannot now claim it is owed storage fees for assets it voluntarily chose to (1) store at its own expense and then (2) use as security for payment.

No Waiver of Affirmative Defenses. BTC Media has not waived any affirmative defenses. After Trade Group filed its Second Amended Complaint, BTC Media was entitled (indeed, required) to plead an answer and affirmative defenses. It did not need leave of Court to plead additional defenses that had developed through the course of discovery. Nor has BTC Media waived any affirmative defenses for failing to raise them at the summary judgment stage. Trade Group cites no authority for the idea that the new defenses BTC Media asserted in its answer are waived.

Agency/Joint and Several Liability/Alter Ego.  BTC Media denies that either BTC Inc. or BTC Media is liable to Trade Group on any of Trade Group's counts 1-6 but admits that to the extent either BTC Media or BTC Inc. are determined to be liable to Trade Group, they are jointly and severally liable.

## 2. Defendant BTC Media, LLC's Counterclaim[2]

BTC Media brings a counterclaim for fraud based on the roughly $1.1 million in booth overcharges hidden and dispersed across the Google Sheet. As explained, Trade Group quoted fixed, all-inclusive booth prices at the outset of planning for Bitcoin 2022. BTC Media relied on those prices to determine how much to in turn sell exhibitor booths to sponsors. As event planning

---

[2] At summary judgment, BTC Media withdrew its DTPA counterclaim.

progressed, there was some slight variation in pricing based on the cost of electrical and lightboxes, but the price for each standard booth package represented on the Google Sheet remained fundamentally consistent with what the parties agreed on. BTC Media continued to rely on the prices represented in the Google Sheet as it sold exhibitor booths to sponsors in the lead-up to Bitcoin 2022.

Because booth sales were the primary means of revenue for BTC Media for Bitcoin 2022, it aimed to make a no-less-than 60–70% profit on each sale. BTC Media's total blended profit margin on the sale of standard booth packages was 77.3%—assuming Trade Group had actually charged the prices the parties negotiated. But as explained, Trade Group charged BTC Media roughly $1.1 million more for standard booths than what is represented in the Google Sheet. Trade Group's hidden overcharges on booths led BTC Media to in turn undercharge booths when it sold them to sponsors. Had BTC Media realized Trade Group was charging more than it represented, BTC Media would have in turn charged its sponsors more so it could realize its profit goals. Based on the expected 22.7% expense-to-profit ratio on booth sales for Bitcoin 2022, BTC Media should have realized an additional $4,817,638.55 in profit. BTC Media is entitled to recover this amount from Trade Group as fraud damages. At minimum, however, BTC Media is entitled to recover, or offset/set off from any judgment, the $1,093,603.95 in hidden booth overcharges that were revealed via Trade Group's internal accounting documents.

## II.    STATEMENT OF STIPULATED FACTS

1.    BTC Media, LLC ("BTC Media") is a startup media and events company that publishes print and digital magazines and hosts cryptocurrency-themed conferences.

2.    BTC Media was formed in 2013 by David Bailey and his mother, Calli Bailey.

3.      BTCI Inc. ("BTCI") is BTC Media's parent corporation and owns 100% of BTC Media.

4.      Didier Lewis's employment with BTC Media began on June 6th, 2022.

5.      Justin Doochin is BTC Media's Event Director.

6.      John Christovich was BTC's Head of Sales during Bitcoin 2021 and 2022.

7.      The Trade Group, Inc. ("Trade Group") is a full-service event marketing and creative design firm with roughly eight thousand projects annually and clients located worldwide.

8.      Neeshu Hajra is Trade Group's Vice President of Business Development. Hajra's responsibilities for Bitcoin 2021 and 2022 were primarily client relations and sales.

9.      Katelyn "KT" Salzmann is employed by Trade Group. During Bitcoin 2021 and 2022, her title was Project Manager. Salzmann's primary responsibility for Bitcoin 2021 and 2022 was project management. Salzmann and the Trade Group project management team also maintained a Google Sheet that Trade Group used to show BTC Media what it would charge for goods and services that Trade Group provided for Bitcoin 2021 and 2022.

10.     Trade Group's primary point of contact with BTC Media for Bitcoin 2021 and 2022 was Event Director Justin Doochin.

11.     BTC Media hired Trade Group to assist in planning and providing goods and services for its Bitcoin 2021 conference in Miami, Florida.

12.     There was no written master services agreement for Bitcoin 2021 or 2022.

13.     Trade Group created a Google Hub for Bitcoin 2021 that provided access to a Google Sheet (the "2021 Google Sheet") that identified the estimated pricing of the goods and services Trade Group provided for the event.

14.    As BTC Media requested and approved goods and services, Trade Group entered them and their associated price into the 2021 Google Sheet.

15.    The BTC Entities had full viewing privileges for the 2021 Google Sheet. BTC Media employees regularly accessed the 2021 Google Sheet and Google Hub for Bitcoin 2021.

16.    Bitcoin 2021 attracted roughly 12,000 attendees.

17.    Trade Group conducted a reconciliation of the amount owed for Bitcoin 2021 after the event and created a final invoice using the 2021 Google Sheet. As part of the reconciliation process, there were pricing revisions made prior to reaching the final invoice amount of $2,557,819.97.

18.    BTC Media paid Trade Group's final invoice for Bitcoin 2021 in full.

19.    After Bitcoin 2021, BTC Media rehired Trade Group to plan, produce, and provide goods and services for Bitcoin 2022.

20.    For Bitcoin 2022, the parties discussed various items for the event, such as an outdoor music festival, a volcano, and exhibitor booths.

21.    The booth packages BTC Media sold to sponsors often also included items such as event tickets and VIP passes.

22.    On November 5, 2021, Neeshu Hajra emailed John Christovich and Justin Doochin revised quotes for standard exhibitor booths. BTC Media had sold a number of standard booth packages before this date.

23.    Trade Group used a Google Sheet (the "2022 Google Sheet") to track estimated prices for goods and services BTC Media requested Trade Group provide for Bitcoin 2022, including booths. Trade Group first presented the 2022 Google Sheet to BTC Media in January 2022.

24.     In January 2022, Trade Group removed the cost of electricity it factored into its booth quotes and adjusted its prices for standard booths to $3,510 for small booth packages, $7,160 for medium booth packages, $14,750 for large booth packages without a lightbox, $18,800 for large booth packages with a lightbox, and $19,250 for large booth packages "added no lightbox." Those prices for each booth package are reflected in the 2022 Google Sheet.

25.     Trade Group also charged BTC for certain custom booths for certain sponsors at various price points. Those prices are reflected on the 2022 Google Sheet. Trade Group also charged BTC's sponsors directly for other booth and sponsor-related items.

26.     BTC Media had full viewing privileges for the 2022 Google Sheet from the time it was first presented. BTC Media was able to make comments on line items on the Google Sheet.

27.     On April 3, 2022, Neeshu Hajra sent Justin Doochin an email that stated, "Just an acknowledgment in writing of the current google doc. Please sign brother!" Attached to the email was a document entitled "Deposit Invoice." The document is dated April 1, 2022, and states that the "Total Price" for the "Estimated Amount Due as of March 14th, 2022," was $15,816,337.61 and provides that this amount "[d]oes not include add, changes or any on-site requests," and "final bill to include all of the above." Of this amount, BTC had previously paid $12,155,192.75. The "Remaining Deposit Due" listed on the document is $3,661,144.86—the difference between the "Total" and the "Amount Paid." Below the "Remaining Deposit Due" amount, the document states, "Final Bill to be Sent Post Bitcoin 2022 Show." The document further states that "Deposit due upon acceptance. Balance due prior to Shipment." And also states that "Trade Group agrees to sell to Purchaser and Purchaser agrees to purchase goods and/or services described above on the terms and conditions within this agreement." The document further states that "The Customer agrees to pay Trade Group reasonable expenses for repossession and enforcement of Trade Group

rights, including any attorney or collection agency fees, together with interest, until the date full payment is made."

28.     Justin Doochin reviewed the Deposit Invoice, signed it, and returned a signed copy to Neeshu Hajra on April 3, 2022. Doochin informed David Bailey he had signed the Deposit Invoice after the fact.

29.     BTC Media agrees that, to the extent the Deposit Invoice is a binding contract (which BTC Media disputes), Justin Doochin had apparent authority to sign it.

30.     Both Trade Group and BTC Media knew there would be a financial reconciliation following Bitcoin 2022 and the amount listed under "Total Amount" on the Deposit Invoice was likely to change before a final invoice was issued.

31.     At Bitcoin 2022 there were 223 standard booths—110 small, 62 medium, and 52 large—and roughly 35,000 attendees. The event took place in Miami, Florida, from April 6–9, 2022.

32.     Didier Lewis's employment with BTCI began on June 6th, 2022.

33.     On July 6, 2022, Trade Group sent BTC Media a final invoice for Bitcoin 2022, reflecting a total balance due of $4,849,724.79.

34.     In July 2022, David Bailey told Neeshu Hajra that BTC Media was experiencing financial difficulties but was working to get Trade Group paid. On July 27, 2022, Bailey wired $35,000 from his personal bank account to Trade Group.

35.     After Bitcoin 2022, BTC Media and Trade Group discussed some of the line-item charges in the 2022 Google Sheet. Trade Group applied credits and a "Neeshu Discount" as a result of some of those discussions.

36.    Trade Group paid sales tax to Florida related to certain goods and services it provided for Bitcoin 2022.

37.    Trade Group paid at least $10,251,206.44 to external vendors for services and goods relating to Bitcoin 2022. Trade Group paid all of its vendors for amounts relating to Bitcoin 2022. This amount does not include additional direct costs or overhead incurred by Trade Group.

38.    BTC Media requested an audit by an independent third party of Trade Group's invoices for Bitcoin 2022. BTC Media agreed to pay half of the fees for such an audit.

39.    Trade Group retained Huselton, Morgan, and Maultsby ("HM&M") to conduct an analysis.

40.    The results of HM&M's analysis concluded that the external vendor costs HM&M sampled were correctly recorded in Trade Group's internal accounting system for Bitcoin 2022. HM&M's analysis further concluded that Trade Group's gross profit margin was 23.1%, net of allocable direct labor costs. The results of HM&M's analysis were provided to BTC Media.

41.    HM&M charged Trade Group $45,405.00 for the analysis. Trade Group paid that amount to HM&M. Trade Group requested that BTC Media pay half of HM&M's fees, but BTC Media has not done so.

42.    On March 30, 2023, BTC Media wired Trade Group $28,740.00 for a desk that Trade Group created for Bitcoin 2022. Trade Group released the desk to BTC Media.

43.    The Final Invoice attached as Exhibit C to Trade Group's Second Amended Complaint was generated from the 2022 Google Sheet. That Final Invoice lists a total amount of $17,214,980.39. To date, BTC Media has paid Trade Group a total of $12,468,932.75 for goods and services provided for Bitcoin 2022, which includes the $35,000 payment from David Bailey's personal account and the $28,740.00 paid by BTC Media for the desk mentioned above.

Accordingly, Trade Group seeks to recover $4,746,047.64, plus interest and attorney fees and costs from Defendants.

44.    BTC Media does not dispute that, where Trade Group quoted certain items (such as certain goods like booths that Trade Group manufactured) and BTC agreed to the quote, it should pay that quote.

45.    According to BTC Media, BTC Media also remains willing to pay a 10–15% markup on third-party invoices (with the exception of furniture, for which BTC Media would agree to pay a 25% markup).

46.    BTC Media was aware that Trade Group was storing goods used at Bitcoin 2022 in a warehouse in Texas.

47.    BTC Media has not paid Trade Group for the storage of the goods used at Bitcoin 2022 or retrieved those goods (except the news desk).

48.    After Bitcoin 2022, BTC Media requested that Trade Group submit a response to a Request for Proposal (RFP) to serve as the general service contractor for BTC Media's Bitcoin 2023 conference ("Bitcoin 2023"). Trade Group submitted its RFP Response for Bitcoin 2023 on November 21, 2022.

49.    BTC ultimately hired a different company, T3 Expo, to serve as general service contractor for Bitcoin 2023.

50.    Bitcoin 2023 was held from May 18–20, 2023. According to Defendants, roughly 15,000 people attended Bitcoin 2023.

51.    On June 2, 2023, BTC Media filed a lawsuit against Trade Group in federal court in Miami, Florida.  BTC Media voluntarily dismissed the lawsuit without prejudice on September 29, 2023.

52.     BTC Media has withdrawn its DTPA counterclaim.

## III.     CONTESTED ISSUES OF FACT

**A.     PROPOSED BY PLAINTIFF**

1.     BTCI is a Bitcoin and blockchain media company formed by David Bailey and his mother, Calli Bailey.

2.     David Bailey is the CEO of BTCI.

3.     Didier Lewis is currently BTCI's  CFO.

4.     David Bailey created several other entities that have been wound up into BTCI, which reports these entities as liabilities on the financial statements it shares with BTC Media. Those entities have no intent or ability to pay their debts to BTCI.

5.     BTCI uses BTC Media to execute contracts on BTCI's behalf.

6.     BTCI and BTC Media operate together, use each other's assets, and transfer money between their accounts without any internal approvals or written internal company transfer policies governing these transfers.

7.     Defendants accepted Bitcoin payments from sponsors and attendees into a wallet in either BTCI's name or Tyler Evans' name for BTC Media's Bitcoin events. Bitcoin conference sponsors paid into a BTC Media operating account.

8.     BTCI's revenue comes from BTC Media. BTCI independently generates no revenue.

9.     BTCI and BTC Media share the same office space and employees. BTCI and BTC Media have no shared services or management-services agreements, and employees who perform work for both do not keep separate timesheets.

10.     BTCI's funds are sometimes used to cover BTC Media's liabilities, including at times when BTC Media is undercapitalized.

11.     BTCI does not charge BTC Media for any overhead costs.

12.     BTC Media's payroll is paid from BTCI's bank account.

13.     BTCI and BTC Media's finances are treated, considered, and labeled as one.

14.     BTC Media is a disregarded entity.

15.     BTCI and BTC Media could not exist as wholly separate entities.

16.     BTCI and BTC Media could not exist independently of one another.

17.     In 2020, BTCI and BTC Media had separated financial statements for purposes of filing for federal loans under the Paycheck Protection Program and COVID-19 Economic Disaster Program and secured roughly $1.3 million of federal aid. After 2020, BTCI and BTC Media returned to reporting a single consolidated financial statement and have done so every year since.

18.     In late 2021, BTCI's board authorized and provided $3.5 million in loans to David Bailey to finance his purchase of his personal home in Puerto Rico. David Bailey did not provide any collateral or security on either loan. The loans' terms were memorialized in two loan agreements in which BTCI was named the lender. BTC Media was not a party to either loan but partially funded the loans by transferring $1 million from its bank account without approval from BTC Media's managers.

19.     On April 25, 2023, Calli Bailey deposited $300,000 into BTCI's account as a partial payment towards one of David Bailey's loans so that BTCI could pay BTC Media's payroll. BTC Media would have been unable to pay its payroll without that deposit.

20.    David Bailey used BTC Media's credit card to purchase a $77,778.85 truck on BTC Media's credit card and did not claim the truck as a business expense. The truck is registered in David Bailey's name.

21.    Before November 5, 2021, BTC Media sold at least 46 booths.

22.    BTC Media did not keep records of the booth prices or changes to booth prices published to vendors or exhibitors at Bitcoin 2022.

23.    BTC Media sold its sponsors who purchased booths numerous items unrelated to booths and did not track the amount earned allocated for each respective booth.

24.    Numerous booths were paid for in Bitcoin to wallets in BTCI's name—not BTC Media's name.

25.    Before November 5, 2021, BTC Media informed Trade Group it wanted 160 standard exhibitor booths to be placed in the exhibitor hall: 88 smalls, 54 mediums, and 18 larges.

26.    On November 5, 2021, Neeshu Hajra emailed John Christovich (BTCI's then-Head of Sales) and Justin Doochin quotes for standard exhibitor booths based on the number of booths requested by BTC Media and the costs for that number of booths, such as building materials, furniture, graphics, electricity, and project-management costs.

27.    Trade Group informed BTC Media that the booth quotes did not include the cost of supervisory labor or the equipment needed to unload the booths at the venue and that increasing the booth count would require increased costs for more supervisors and equipment.

28.    Charges for booths were added to the Account after BTC Media provided booth prices to exhibitors and sponsors.

29.    In March 2022, BTC Media lacked sufficient funds to pay an amount due to Trade Group for Bitcoin 2022 and was transferred $1.1 million by BTCI to help cover that debt.

30.     By mid-March 2022, the Account reflected a subtotal of $14,921,026.05 in goods and services provided to BTC Media for Bitcoin 2022. By then, BTC Media had paid $12,155,192.75 on Trade Group's invoices for goods and services listed on the Account and corresponding sales tax.

31.     Trade Group invoiced BTC Media for goods and services prior to Bitcoin 2021 and BTC Media paid those invoices in full.

32.     The 2022 Google Sheet ("2022 Account") is an Account.

33.     In addition to the $10,251,206.44 in external vendor costs incurred by Trade Group for Bitcoin 2022, Trade Group incurred significant additional labor and other direct costs relating to internal raw materials and overhead that are not reflected in that amount.BTC Media agreed to pay Trade Group for the goods and services Trade Group provided to BTC Media in connection with Bitcoin 2022 (the "Event Agreement"). On April 3, 2022, Neeshu Hajra emailed Justin Doochin an express agreement for the price of goods and services due on the Account at the time the Deposit Invoice was sent (the "Deposit Invoice Agreement"). The amount due under the Event Agreement prior to Bitcoin 2022 was $3,661,144.86 and based on the subtotal amount of $14,921,026.05 for goods and services listed on the Account, plus $895,311.56 in sales tax, and minus $12,155,192.75 for all payments made by BTC Media. The Deposit Invoice Agreement memorialized that balance and Defendants' assent to pay Trade Group for the goods and services it provided to Defendants under the Event Agreement. After Bitcoin 2022, and after applying all offsets, credits, and payments by BTC Media, the amount due under the Event Agreement is $4,746,047.64.

34.     Justin Doochin had actual authority to sign the Deposit Invoice Agreement.

35.     Both Trade Group and BTC Media knew there would be a financial reconciliation following Bitcoin 2022 and the amount listed under "Total Amount" on the Deposit Invoice Agreement would increase before a final invoice was issued.

36.     BTC Media reported the $15,816,337.61 total amount and the $3,661,144.86 amount due stated on the Event Agreement as a business expense to the Internal Revenue Service.

37.     Over the four-day event, the project required additional services and BTC Media requested add-ons, changes, and on-site requests that were added to the Account and was ultimately charged $1,084,902.78 for them.

38.     After Bitcoin 2022, BTC Media requested that Trade Group begin planning for BTC Media's Bitcoin 2023 event ("Bitcoin 2023").

39.     Trade Group began planning for Bitcoin 2023 and coordinated with BTC Media to store various goods used at Bitcoin 2022 for use at Bitcoin 2023.

40.     Trade Group informed BTC Media that it had coordinated with a warehouse in Texas to store BTC Media's goods for Bitcoin 2023.

41.     In April 2023, Trade Group requested payment from BTC Media for the storage of BTC Media's goods.

42.     BTC Media has not paid Trade Group for the storage of BTC Media's goods or retrieved those goods.

43.     BTC Media filed a notice of removal stating that its members were David Bailey, Calli Bailey, and Tyler Evans. BTC Media's only member is BTCI.

44.     BTC Media's certificate of interested persons stated that it has no parent corporation, no corporation owns 10% more of its stock, and no entity has a financial interest in the case's outcome. BTCI owns 100% of BTC Media and is BTC Media's parent corporation.

45.    Didier Lewis filed three sworn declarations that he was employed by BTC Media. Didier Lewis is not employed by BTC Media and is employed by BTCI.

46.    Justin Doochin has an employment agreement with BTC Media and no employment agreement with BTCI. Justin Doochin is paid by BTCI and testified that he is employed by BTCI.

47.    BTC Media lacked the liquidity to make a $4.7 million payment to Trade Group in 2022 or 2023.

48.    BTC Media owes Trade Group the full amount for products manufactured by Trade Group.

49.    The Final Invoice and the Event Agreement amount for goods and services related to Bitcoin 2022 have not been paid.

50.    BTC Media owes Trade Group some amount for goods and services related to Bitcoin 2022.

51.    BTC Media has not paid Trade Group for the standard booth charges listed on the Account.

52.    The fees incurred by Trade Group for the storage of BTC Media's goods total $151,000 to date and continue to accrue. Trade Group's storage provider, Pegasus Logistics Group, continues to charge Trade Group $4,500 each month for the storage services that relate to the assets stored for BTC Media.

53.    On or around November 14, 2022, BTC Media determined that it would not use Trade Group's services for Bitcoin 2023 and hired a different company, T3 Expo, on November 23, 2022 to provide those services. BTC Media did not advise Trade Group that it was not retaining Trade Group for Bitcoin 2023 services until after it hired T3 Expo.

54.    Trade Group disputes that Trade Group agreed that markups for goods and services would not exceed 10–20%.

55.    BTC Media accepted all the goods and services that were charged by Trade Group to BTC Media on the Account.

56.    HM&M was an independent auditor when chosen by Trade Group. Trade Group had never retained HM&M prior to the audit for Bitcoin 2022.

57.    Trade Group charged BTC Media the amounts set forth on the Account, including the amount for the standard booths.

58.    Trade Group did not charge BTC Media $2.9 million for standard booths for Bitcoin 2022. Trade Group charged BTC Media the amount set forth on the Google Sheet.

59.    Trade Group's internal accounting documents were prepared only for internal use. Trade Group's internal accounting documents, including sales orders, do not reflect its standard booth costs or the amount Trade Group charged BTC Media for standard booths.

60.    Trade Group did not gratuitously provide BTC Media storage for its goods used at Bitcoin 2022. Trade Group provided the services to BTC Media only on the condition that BTC Media retain Trade Group as a general services contractor for Bitcoin 2023.

61.    Trade Group provided valuable services to BTC Media related to Bitcoin 2023. Trade Group expected to be compensated for those services. BTC Media has not paid Trade Group for those services.

62.    The prices that Trade Group charged BTC Media for the goods and services related to Bitcoin 2022 were usual, customary, and reasonable.

63.    The prices on the Account were also usual, reasonable, and customary in the trade show industry.

64.     BTC Media benefited from HM&M's audit.

**B.     PROPOSED BY DEFENDANT**

1.     The parties dispute whether BTC Media agreed to pay for everything on the Google Sheet at whatever price Trade Group decided.

2.     The parties dispute whether the Deposit Invoice was a meeting of the minds on all essential terms sufficient to form a binding contract.

3.     The parties dispute whether there was an agreement for Trade Group to limit its markups on third-party invoices by no more than 10–15% or 10–20%.

4.     The parties dispute whether Trade Group's quoted prices for standard booth packages were fixed and all-inclusive.

5.     The parties dispute whether Trade Group promised that the Google Sheet would accurately reflect the parties' governing agreements regarding markups and fixed quotes.

6.     The parties dispute whether BTC Media's acceptance of the deliverables on the Google Sheet was conditional on Trade Group fulfilling its promise that the Google Sheet would accurately reflect the parties' governing agreements regarding markups and fixed quotes.

7.     The parties dispute whether the charges in the Google Sheet are usual, customary, and/or reasonable.

8.     The parties dispute what the markups for Bitcoin 2022 actually were.

9.     The parties dispute whether the prices of the standard booth packages in the Google Sheet were false because Trade Group really charged more.

10.     The parties dispute whether any extra booth costs were attributable to additional equipment or labor needed because BTC Media asked Trade Group to build more booths than originally expected.

11.     The parties dispute whether Trade Group knew the prices of the standard booth packages in the Google Sheet were false.

12.     The parties dispute whether BTC Media relied on Trade Group's booth quotes in deciding how much to charge sponsors for booths.

13.     The parties dispute whether BTC Media lost $4,816,642.57 in profits because it underpriced booths to sponsors.

14.     The parties dispute whether amounts associated with higher-than-agreed-upon markups and higher-than-agreed-upon booth charges were dispersed and hidden in other line items in the Google Sheet.

15.     The parties dispute whether BTC Media accepted all of the goods and services on the Google Sheet.

16.     The parties dispute whether BTC Media ratified the Deposit Invoice or any "final invoice" issued by Trade Group.

17.     The parties dispute whether HM&M's analysis was an audit according to professional accounting standards.

18.     The parties dispute whether HM&M's analysis constitutes an independent audit BTC Media agreed to pay for.

19.     The parties dispute whether BTC Media benefitted from HM&M's audit.

20.     The parties dispute whether Trade Group gratuitously provided storage for assets used in Bitcoin 2022.

21.     The parties dispute whether the assets that Trade Group is storing even belong to BTC Media.

22.    The parties dispute whether Trade Group used the assets it was storing as leverage to get BTC Media to pay its final bill.

23.    The parties dispute the reasonableness of Trade Group's attorney's fees.

## IV.    CONTESTED ISSUES OF LAW

A.    **PROPOSED BY PLAINTIFF**

1.    BTC Media agreed to pay Trade Group for the goods and services Trade Group provided to BTC Media in connection with Bitcoin 2022 (the "Event Agreement").

2.    The Event Agreement was an offer that could create a binding contract if accepted.

3.    The Event Agreement is a binding contract.

4.    BTC Media accepted and agreed to pay a total of $17,214,980.39 to Trade Group for Bitcoin 2022, which includes the amount outstanding of $4,746,047.64, by its acts, conduct, and acquiescence pursuant to the agreement for adds, changes, and any on-site requests and the parties' course of dealing and conduct.

5.    Trade Group is entitled to recover $4,746,047.64 from BTC Media for amounts due under the Event Agreement, as well as attorneys' fees and interest.

6.    BTC Media agreed to pay the amount pursuant to the Event Agreement.

7.    The course of dealing between the parties indicated that there was an agreement, express or implied, that BTC Media agreed to pay Trade Group for the goods and services Trade Group provided to BTC Media in connection with Bitcoin 2022.

8.    BTC Media agreed to pay interest and attorneys' fees to Trade Group incurred by Trade Group in collecting amounts due under the Event Agreement.

9.    The 2022 Google Sheet constitutes an Account under applicable law.

10.    BTC Media agreed to pay the amounts set forth on the Account.

11.     BTC Media agreed to pay the amount set forth on the Final Invoice.

12.     A suit-on-account claim under Texas law does not require a contract on the prices of goods and services in which payment is sought.

13.     Quantum meruit is a cause of action or an alternative source of relief to breach-of-contract and suit-on-account claims under Texas law.

14.     Trade Group disputes the admission of extrinsic evidence to add to, vary, or contradict the terms of the Event Agreement.

15.     Non-material facts do not prevent ratification of the Event Agreement.

16.     Trade Group is not required to prove fraud in order to prevail on its alter-ego theory under Delaware law.

17.     The economic-loss rule applies to a fraud claim under Texas law.

18.     Trade Group did not fraudulently induce BTC Media into entering an agreement.

19.     The material terms of the Event Agreement were that BTC Media would pay Trade Group for the goods and services at the pricing set forth in the Account. BTC Media agreed to pay the amounts set forth on the Deposit Invoice Agreement and on the Final Invoice.

20.     Justin Doochin had actual authority to sign the Deposit Invoice Agreement.

21.     BTC Media cannot recover lost revenue under Texas law.

22.     BTC Media cannot recover any damages for its fraud counterclaim because benefit-of-the-bargain damages are not recoverable for a fraud claim under Texas law and all other economic damages are not recoverable because BTC Media did not pay Trade Group for the booth charges.

23.     BTC benefited from the audit analysis conducted by HM&M and Trade Group's storage of BTC Media's assets.  Trade Group is entitled to recover the value of the audit analysis and storage of BTC Media's assets from Defendants.

**B.     PROPOSED BY DEFENDANT**

1.      The parties dispute the essential terms of what Trade Group has dubbed the "Event Agreement."

2.      The parties dispute whether the 2022 Google Sheet is a legal "account" Trade Group can recover on.

3.      There is no enforceable "Event Agreement" because of a lack of all material terms.

4.      There is no enforceable "Event Agreement" because there was no meeting of the minds.

5.      There is no enforceable "Event Agreement" because the "Deposit Invoice" is not binding.

6.      There is no enforceable "Event Agreement" because BTC Media did not agree to pay the total amounts charged by Trade Group.

7.      There is no enforceable "Event Agreement" because it was procured by Trade Group's fraud.

8.      There is no enforceable agreement concerning audit fees because there was no meeting of the minds.

9.      There is no enforceable agreement concerning audit fees because of a lack of all material terms.

10.     There is no enforceable agreement concerning audit fees because BTC Media did not agree to pay half of an audit conducted by an auditor unilaterally selected by Trade Group.

11.     There is no enforceable agreement concerning audit fees because BTC Media did not agree to pay half of an audit that was not regarding a final invoice.

12.     Trade Group cannot enforce an "Event Agreement" because Trade Group breached it first.

13.     Trade Group failed to satisfy all conditions precedent to recover under an "Event Agreement."

14.     Trade Group cannot enforce an agreement concerning audit fees because Trade Group breached first.

15.     Trade Group failed to satisfy all conditions precedent to recover under an agreement concerning audit fees.

16.     Trade Group is not entitled to recover under a breach of an "Event Agreement" because BTC Media is entitled to an offset and setoff for amounts owed to Trade Group by BTC Media (if any) and/or already paid to Trade Group by BTC Media.

17.     Trade Group is not entitled recover under a breach of an agreement concerning audit fees because BTC Media is entitled to an offset and setoff for amounts owed to BTC Media by Trade Group and/or already paid by BTC Media.

18.     BTC Media did not agree to an "Account" as described by Trade Group.

19.     BTC Media did not agree to pay an "Account" as described by Trade Group.

20.     The charges by Trade Group on an "Account" are not just.

21.     The charges by Trade Group on an "Account" are not made pursuant to an agreement.

22.     The charges by Trade Group on an "Account" are not reasonable and customary.

23.     Trade Group cannot succeed on a suit-on-account claim because of Trade Group's fraud.

24.     Trade Group cannot recover under a suit-on-account claim because BTC Media is entitled to an offset and setoff for amounts owed to Trade Group by BTC Media (if any) or already paid by BTC Media.

25.     Trade Group cannot recover under a quantum meruit theory because BTC Media did not benefit from or accept goods and services fees incurred by Trade Group in connection with Bitcoin 2022.

26.     Trade Group cannot recover under a quantum meruit theory because BTC Media did not benefit from or accept audit fees incurred by Trade Group.

27.     Trade Group cannot recover under a quantum meruit theory because BTC Media did not benefit from or request storage fees incurred by Trade Group.

28.     Trade Group cannot recover (1) goods and services fees; (2) audit fees; and (3) storage fees under a quantum meruit theory because of the existence of an express agreement.

29.     Trade Group cannot recover under its quantum meruit claims because BTC Media is entitled to an offset and setoff for amounts owed by BTC Media to Trade Group (if any) or already paid by BTC Media to Trade Group.

30.     Trade Group cannot avoid BTC Media's fraud claim based on the economic loss rule.

31.     BTC Media is entitled to recover damages on its fraud claim.

32.     Trade Group is not entitled to recover attorney's fees by contract or statute.

33.     BTC Media denies that either BTC Inc. or BTC Media is liable to Trade Group on any of Trade Group's counts 1-6 but admits that to the extent either BTC Media or BTC Inc. are determined to be liable to Trade Group, they are jointly and severally liable.

## V.    ESTIMATED TRIAL LENGTH

Estimated Length of Trial: Under ECF No. 160, the Court has allotted the parties 8 hours per side to put on their case, including cross examination and rebuttal. Under ECF No. 160, the parties will each have 15 minutes for voir dire, 15 minutes for opening statements, and 20 minutes for closing arguments.

## VI.    ADDITIONAL MATTERS AIDING IN THE DISPOSITION OF CASE

Joint and Several Liability of BTC Inc.:  Defendants offered to the following stipulation to streamline the issues and the evidence to be tried, but Trade Group will not agree to those terms:

> The parties jointly stipulate that BTC Inc. will be jointly and severally liable for any judgment Trade Group may obtain against BTC Media, LLC in this case. The parties further stipulate that they will not disclose or refer to the foregoing stipulation in the presence of the jury, nor will they offer or attempt to offer evidence to the jury of (1) the financial relationship between BTC Inc. and BTC Media, LLC, (2) any failure to follow corporate formalities by BTC Media, LLC or BTC Inc., or (3) any evidence whose sole relevance is to prove Trade Group's veil-piercing, alter ego, or principal–agent liability allegations.

Plaintiff responds that: For the reasons mentioned in Trade Group's responses to Defendants' Motion in Limine and Motion for Leave to Amend Answers, Trade Group will not agree to Defendants' proposed stipulation. And Defendants' two motions on the issue have been denied by the Court. Defendants' proposal is not acceptable to Plaintiff for a number of reasons. First, Defendants' proposed stipulation seeks to preclude Plaintiff from introducing evidence that is relevant to Plaintiff's claims and provides context to Defendants' refusal to pay the amounts owed to Plaintiff because of its alleged "financial distress," all the while Defendants were loaning

millions of dollars to its CEO and President for the purchase of a home in Puerto Rico in exchange for no collateral or consideration.  Second, BTC Media misrepresented its corporate ownership on numerous filings with this Court and BTC Inc.'s CFO testified falsely in declarations filed with this Court relating to the corporate overlap and failure to follow corporate formalities between BTCI and BTC Media, which is directly relevant to BTCI's, BTC Media's, and Didier Lewis's credibility before this Court and/or jury.  Defendants' proposed stipulation seeks to unreasonably constrain Plaintiff's ability to present relevant evidence before this Court and/or jury that should be considered in determining Plaintiff's claims.

On August 13, 2024, Plaintiff proposed the following stipulation to which Defendants did not agree:

> As we stated previously, Trade Group will conditionally agree to a joint stipulation filed with the Court and signed by Judge Pittman prior to trial that contains a ruling that Trade Group's alter ego claim is granted as a matter of law and that BTC Media and BTC Inc. will be jointly and severally liable for any judgment in this case in favor of Trade Group, subject to Defendants' withdrawal of their objections to the exhibits listed below and any testimony Trade Group may elicit at trial relating to those exhibits, including the stipulation that Trade Group is not constrained in any manner to put on this evidence by the joint and several liability and alter ego stipulations.  We will not agree to any stipulation that would limit our ability to put on that evidence.  Otherwise, Trade Group objects to and opposes BTC's proposed amended answer.

> And here is why.  Your clients have asserted "no agreement" as the reason they refused to pay the amounts owed to Trade Group.  Contrary to that assertion, Trade Group will present evidence that the actual reason BTC didn't pay the amounts owed to Trade Group is because they preferred to pay and enrich themselves (and their officers and directors) instead and they mismanaged funds.  By way of example, at the same time BTC was incurring deposit obligations related to the trade show, rather than pay Trade Group, BTC instead chose to loan $3.5 million from its cash accounts to its president, David Bailey.  That amount would have covered almost the entirety of the amount set forth of the April deposit invoice.  This evidence also shows Defendants' motive behind breaching the agreement, and is corroborated by the evidence relating to the positions that BTC Media and BTC Inc. took with respect to the amounts owed to Trade Group on its own financial statements.

> The Exhibits are:

TTG Ex. Nos. 203, 207, 221, 234, 249, 250, 251, 253, 254, 255, 258, 260, 261, 262, 320, 335, 344, 348.

On August 14, 2024, Defendants filed their Motion for Leave to File Amended Answers to Plaintiff's Second Amended Complaint, seeking to amend their answers to state the following:

BTC Media denies that either BTC Inc. or BTC Media is liable to TTG on any of TTG's counts 1-6 but admits that to the extent either BTC Media or BTC Inc. are determined to be liable to TTG, they are jointly and severally liable.

*See* ECF No. 165. The Court denied that Motion in its entirety. As stated above, Trade Group does not contest that BTC Media and BTCI are jointly and severally liable under the alter ego, single business enterprise, or agency theories. However, Trade Group objects to Defendants' proposed inclusion of the paragraph titled "Agency/Joint and Several Liability/Alter Ego." in section I.B.1, as well as paragraph 33 in section IV.B, in light of the Court's August 16, 2024 Order denying Defendants' Motion for Leave to File Amended Answers to Plaintiff's Second Amended Complaint. *See* ECF No. 170.

**SO ORDERED** on this **19th day of August 2024.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE